UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Darren Brady,
 Plaintiff

 v.             Case No. 19-cv-655-SM
                Opinion No. 2021 DNH 114

Weeks Medical Center
and John Ford, M.D.,
 Defendants


**O R D E R**

Pro se plaintiff, Darren Brady, brings this action seeking damages for alleged violations of state and federal law. Specifically, he claims that the defendants, Weeks Medical Center ("WMC") and Dr. John Ford, refused to provide him with required medical treatment when he presented to the WMC Emergency Department complaining of back pain. Moreover, says Brady, defendants' wrongful conduct was motivated by a racially discriminatory animus. He advances claims under the Emergency Medical Treatment and Active Labor Act, Title VI of the Civil Rights Act of 1964, and New Hampshire's Law Against Discrimination. He also brings common law claims for medical malpractice.

Defendants move for summary judgment on all remaining claims in Brady's complaint, asserting that there are no genuinely disputed material facts and saying they are entitled to judgment as a matter of law. For the reasons discussed, that motion is granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on

the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29-30 (1st Cir. 2014).  In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451-52 (1st Cir. 2014).  See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Background**

On June 2, 2018, shortly after 8:00 p.m., Brady presented to the WMC Emergency Department, complaining of lower back pain.  Based on prior experience with similar discomfort, he assumed it was a recurrence of sciatica.  Other than pain radiating from his back and into his leg, Brady had no other complaints or medical issues.

After checking in at reception, Brady was taken to an examination room.  There, a triage nurse took his medical history and vital signs, including blood pressure, pulse, temperature, and oxygen saturation rate.  All were normal.  At his deposition, Brady testified that he felt the nurse did her

job appropriately and he had no complaints with the manner or scope of her examination.

Once the triage nurse completed her initial interview and examination, she informed Dr. Ford that Brady was ready for him. Dr. Ford entered the examination room and Brady described the severity and location of his pain. Dr. Ford believed that the more Brady explained his situation, the more he began to contradict himself by giving varying descriptions of the location of his pain.

> I remember entering the examination room after the triage nurse completed her assessment. Mr. Brady was unaccompanied, and I recall that he was lying on his stomach on the stretcher, which is unusual for someone with back pain. I began speaking with Mr. Brady about his back pain to understand the location and quality of the pain. Mr. Brady gave me varying descriptions. First, he described the back pain as radiating down to his knee, but then he said it was radiating into his groin. In a third version, Mr. Brady said that the pain radiated down to his foot. I recall asking Mr. Brady about these inconsistencies, and trying to do so nicely.

John E. Ford, M.D., Answers to Interrogatories (document no. 26-7) at 14.

As the interaction between the two men continued, Brady became increasingly animated, agitated, and loud. See, e.g., Deposition of Darren Brady (document no. 26-4) at 70 ("[Dr.

4

Ford] said I was making too much noise, and I'm overreacting. I'm -- I shouldn't be screaming. . . and because I was screaming and making a fuss about it, that I was overreacting"); id. at 72 (testifying that he wanted Dr. Ford to "do something to take away me screaming and yelling."); see also John E. Ford, M.D., Answers to Interrogatories at 14 ("I could not complete taking Mr. Brady's history or begin a physical examination because Mr. Brady became angry and began swearing."). The parties disagree as to whether Dr. Ford simply refused to treat Brady, see Brady Deposition at 82 ("They told me I had to leave. He said I wasn't experiencing any pain. They said you got to leave."), or whether Brady terminated his interaction with Dr. Ford, see, e.g., Weeks Medical Center ED Report (document no. 26-3) at 2 ("[Mr. Brady] became angry and stated he would go to LRH for better care and did not allow further history to be obtained or exam."); see also Ambulatory Assessment (document no. 26-3) at 6, 7, & 8 (noting that Brady was discharged from the hospital "AMA" - that is, against medical advice).

All agree that Brady left the examination room and, as he was making his way back to the waiting area, he fell to the ground. One witness reported that Brady was "very loud and thrashing on the floor." Statement of Triage Nurse Rebecca Shanks (document no. 26-6) at 1. Nurse Shanks further recounted

5

that, "Dr. Ford went to the ED waiting room and tried to talk to the patient, with no success. After the patient wouldn't talk to Dr. Ford, and continued to be loud, the Lancaster Police Department was notified to come for assistance." Id. See also Statement of Security Officer Richard Gilson (document no. 26-6) at 2 ("I heard him yelling and cursing out the doctor, saying he was leaving. Doctor Ford came out of the ER and asked the person to return so he could treat him, the person yelled he did not want to stay at Weeks and was leaving. He wanted to make a phone call, went to the ER waiting room, grabbed the phone, [and] flopped on the floor, yelling on the floor. After that he stayed on the floor. . . . He was cursing and yelling so loud he was intimidating other people in the waiting room and they left.").

Eventually, an officer escorted Brady to the exit where he apparently fell to the ground again. See id. ("The police officer asked him to leave the building. . . . When he got outside, he flopped onto the sidewalk and started yelling and screaming again."). A family member recorded a portion of those events, which Brady published to the internet. See https://www.youtube.com/watch?v=rh0RDY_pS8s. That video shows Brady alternating between shouting obscenities at the officer and rolling around on the ground, moaning in apparent pain.

6

Brady also appears to be directing the person producing the video to make certain that she captures particular aspects of the scene.

Brady testified that although he was in significant pain, he was never "in fear of [his] life," noting that "I've had this situation before in Littleton so I already know it's not life-or-death situation." Brady Deposition at 56. When asked what led him to conclude that racial animus affected the way defendants treated him, Brady testified that:

> So to answer your question is – is that without the proper information that know if he has – him or the hospital has called the cops on past patients seeking help, I don't have the information. Going by what the townspeople say – and going by my own observations, no patient, white, Jewish, Chinese, the hospital's never called the cops on anyone. So why do I believe that the incident is based upon my race is because it's never happened before in that hospital.
>
> * * *
>
> Another reason I believe it was my race, maybe they think black people handle pain better. I don't know what was going on in his mind. Maybe he think black people lying. He believes the pain wasn't shooting down to my leg. I can't answer that question.

Brady Deposition at 78-80. Later in his deposition, Brady was again asked why he believed Dr. Ford's allegedly skeptical attitude toward him was motivated by racial animus.

7

> I don't know. I don't know. Like again I said he could have wanted to go eat. He could have had a phone call. He could have had more patients that he felt needed his help more. I don't know per se if it was because my skin color, but what I do feel is me being black had something to do with it.

Id. at 133. When asked whether Dr. Ford used any derogatory language with him, Brady said, "No. It just seemed like it was a debate. Seemed like he just wanted to debate whether or not the pain was coming from my back down to my lower thighs and stuff." Id. at 81.[1]

There is no evidence that WMC or Dr. Ford failed to comply with any of the hospital's procedures in dealing with Brady, nor is there any evidence (other than Brady's testimony about his "beliefs") that he was treated differently than any other patient under similar (albeit fairly unusual) circumstances.

After Brady left WMC, his girlfriend drove him to another local hospital, where he was observed to be in "mild to moderate distress" with "some left lower sciatic and buttock tenderness." Littleton Regional Healthcare Emergency Department Report (document no. 26-5) at 2. Again, all his vital signs were

---

[1] Although defendants' counsel only alludes to the issue during Brady's deposition, it is, perhaps, worth noting that Brady's interaction with Dr. Ford occurred during the height of New Hampshire's opioid crisis.

normal. He was given Toradol (a non-narcotic pain reliever and anti-inflammatory) and Flexeril (a muscle relaxant used to treat spasms) and discharged.

Brady subsequently filed this action. Discovery closed approximately six months ago and the date by which Brady was to have disclosed expert medical witnesses passed more than eight months ago. See Order on Preliminary Pretrial Conference (document no. 11). Brady did not disclose any expert witnesses. Nor did he depose any of the relevant witnesses. Nor did he respond to at least two orders issued by the magistrate judge. By order dated April 27, 2021 (document no. 31), Brady was directed to show cause why this action should not be dismissed due to his failure to prosecute or otherwise comply with the orders of the court. Brady filed a non-responsive reply (document no. 37), in which he complained of judicial corruption and stated that "the reason to allow my case to move forward is simply cause of the face of justice." Id.

Parenthetically, the court notes that while Brady is pro se, he is no stranger to state and federal civil litigation. He is, therefore, generally familiar with the rules of court, as

9

well as the requirements of pretrial discovery and motion practice.[2]

**Discussion**

Brady's claims can be divided into two broad categories: those relating to the quality of medical treatment he received and those related to racial discrimination.

I. Medical Treatment.

Turning first to the claim against Weeks Medical Center under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, the undisputed record evidence reveals that Brady's claim fails as a matter of law.

---

[2] In this court alone, Brady has filed at least five civil actions (including this one) in the past three years. See Brady v. Whitefield Police Dept., No. 19-cv-147-JL; Brady v. Family Dollar, Inc., 19-cv-616-SM; Brady v. Roberts, 20-cv-208-PB; and Brady v. Roberts, 20-cv-209-SM.

He appears to have been equally busy in the state court system. See, e.g., Brady v. Weeks Medical Center, No. 214-2018-CV-00094 (N.H. Super. Ct., Coos Cnty., Feb. 21, 2019); Brady v. Holmander, No. 2018-0494, 2019 WL 2375376 (N.H. May 6, 2019); Brady v. Holmander, No. 2018-0351, 2019 WL 2373743 (N.H. May 3, 2019); Brady v. Family Dollar, Inc., No. 2018-0443, 2019 WL 1437224 (N.H. Mar. 29, 2019); Brady v. St. Pierre, No. 2018-0075, 2019 WL 1255555 (N.H. Feb. 22, 2019).

Broadly speaking, EMTALA imposes two requirements on covered hospitals. "First, it requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995) (emphasis supplied; citations omitted). So, to prevail on his EMTALA claim against WMC, Brady must establish that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

Id. (citing Miller v. Medical Ctr. of Sw. La., 22 F.3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990) (emphasis supplied)). An "emergency medical condition" is:

11

>  a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —
>
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>>
>> (ii) serious impairment to bodily functions, or
>>
>> (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A).  "The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).

WMC does not dispute that the first two elements of Brady's EMTALA claim are present.  That is, WMC is a participating hospital and Brady arrived at its emergency department seeking treatment.  As to the third element of Brady's claim, however, WMC asserts that he cannot, as a matter of law, carry his burden of proof.

In many (if not most) EMTALA cases, expert medical testimony is required to prove a violation of the statute – that is, a plaintiff must provide expert testimony that the screening provided was inappropriate, that the plaintiff suffered from an emergency condition, and/or that the defendant failed to properly stabilize an emergency condition prior to discharge or transfer.  Expert testimony is also frequently required to establish a plaintiff's damages (i.e., that the plaintiff's original injury that brought him or her to the hospital was exacerbated by the hospital's misconduct).

Given the facts presented in this case, expert medical testimony is plainly required.  Absent such expert testimony, Brady cannot demonstrate to a lay jury that the medical screening he received was "inappropriate."  Nor can he show that he was suffering from an "emergency medical condition," since it's entirely unclear whether back pain of the sort Brady described meets the statutory definition.  See 42 U.S.C. § 1395dd(e)(1)(A).  Nor can he demonstrate that he was improperly discharged or turned away without necessary and proper "stabilization" (or even that such "stabilization" was required, given his condition).  See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 56-57 (1st Cir. 2010) (discussing the need for expert medical testimony in EMTALA cases); Ortiz-Lopez v.

13

Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 36-37 (1st Cir. 2001) (same); see generally Alvarez-Torres v. Ryder Mem'l Hosp., Inc., 582 F.3d 47, 51-52 (1st Cir. 2009) ("The duty to stabilize under EMTALA does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient.") (citation and internal punctuation omitted).

    The same is true with respect to Brady's common law medical malpractice claims against both WMC and Dr. Ford: absent expert medical testimony, those claims cannot proceed. See N.H. Rev. Stat. Ann. ("RSA") 507-E:2 (requiring, in any case seeking compensation for medical injury, expert medical testimony: (1) as to the standard of reasonable medical practice in the particular field or specialty at issue; (2) that the medical care provider failed to act in accordance with that standard; and (3) that, as a proximate result, the plaintiff suffered injuries); see also Smith v. HCA Health Servs. of New Hampshire, Inc., 159 N.H. 158, 161 (2009); Goudreault v. Kleeman, 158 N.H. 236, 245 (2009).

II. <u>Racial Discrimination</u>.

Brady also claims he was the victim of racial discrimination in violation of both state and federal law. <u>See</u> Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and New Hampshire's Law Against Discrimination, RSA ch. 354-A. Those claims also fail as a matter of law.

Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Generally speaking, then, Brady must show that "defendant[s] treated members of one race differently and less favorably than members of another race and that the defendant[s] did so with a racially discriminatory purpose." <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 980 F.3d 157, 195–96 (1st Cir. 2020) (citing <u>Washington v. Davis</u>, 426 U.S. 229, 239-40 (1976); <u>Alexander v. Sandoval</u>, 532 U.S. 275, 280 (2001); and <u>Goodman v. Bowdoin Coll.</u>, 380 F.3d 33, 43 (1st Cir. 2004)).

Initially, Brady must make out a <u>prima facie</u> case showing that defendants acted with a racially discriminatory animus and that there was a causal connection between that discriminatory

15

animus and defendants' treatment of him.  See generally Doe v. Brown Univ., No. CV 17-191-JJM-LDA, 2020 WL 5729427, at *9 (D.R.I. Sept. 24, 2020) (discussing the elements of the burden-shifting analysis employed in discrimination cases) (citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 602-03 (1983); Sandoval, 532 U.S. at 280; and Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, __ U.S. __, 140 S. Ct. 1009, 1014-15, 206 L.Ed.2d 356 (2020)); see also Cornelius-Millan v. Caribbean Univ., Inc., 261 F. Supp. 3d 143, 150 (D.P.R. 2016) (explaining why and how courts have applied the McDonnell Douglas burden-shifting framework to claims under Title VI); Rashdan v. Geissberger, 764 F.3d 1179, 1182 (9th Cir. 2014) (joining the other circuit courts of appeals that have applied the McDonnell Douglas burden-shifting framework to disparate treatment claims under Title VI).  If Brady were to make out a prima facie case of discrimination, defendants would then have to respond with a racially neutral explanation for their conduct.  If defendants did so, the burden would revert to Brady to demonstrate that defendants' explanation is merely a pretext for racial discrimination.

To prevail on his claim under New Hampshire's Law Against Discrimination, Brady must demonstrate that one or both defendants intentionally discriminated against him on the basis

16

of his race. See RSA 354-A:17; see also Franklin Lodge of Elks v. Marcoux, 149 N.H. 581, 590, 825 A.2d 480, 488 (2003) ("The plain language of this provision, standing alone, suggests that a complainant must show intentional misconduct in order to prevail.").

In short, then, to prevail on either of his racial discrimination claims, Brady must be able to demonstrate that the defendants' discrimination against him was intentional and that his race (African American) was a motivating factor in (if not the "but-for" cause for) their allegedly deficient medical treatment of him and/or their decision to contact the police when he became disruptive. Such evidence is, however, entirely lacking.

Brady bases his discrimination claims solely upon his personal experience, perceptions, beliefs, and "what the townspeople say." See generally Brady Deposition at 78-81. He concedes that Dr. Ford never used any racially-charged or disparaging language, and he has not pointed to any evidence suggesting that anyone else at the hospital did so. He also admits that he was "screaming," "yelling," and disruptive. For their part, defendants have offered legitimate, non-discriminatory explanations for their conduct. First, they say

17

that Brady became so angry and unruly that Dr. Ford could not complete his examination of him. Next, they explain that hospital security (and eventually the local police) were contacted because Brady was causing a loud disturbance in the Emergency Department waiting area – an explanation supported by, among other things, the video Brady uploaded to the Internet, which shows him being loud, abusive, and profane. Consequently, even if Brady had been able to establish a prima facie case of discrimination, he has failed to rebut defendants' legitimate, non-discriminatory explanations for their conduct.

## Conclusion

The court need not belabor the point. Brady cannot prevail on his medical claims because, under the circumstances presented, they require the testimony of a medical expert and Brady has disclosed none. He cannot prevail on his racial discrimination claims because he has failed to point to any admissible evidence even hinting that defendants' actions were motivated by a racial animus and nothing in the record suggests any racial animus by anyone associated with the hospital.

For the foregoing reasons, as well as those set forth in defendants' memorandum of law, defendants' Motion for Summary Judgment (**document no. 26**) is granted. Plaintiff's Motion for

Summary Judgment (**document no. 28**) is denied. All other pending motions are denied as moot.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

                                        Steven J. McAuliffe
                                        United States District Judge

July 22, 2021

cc:   Darren Brady, pro se
       Beth G. Catenza, Esq.